## FARLEY *v.* HILL *et al.*

*(Circuit Court, D. Minnesota.* September 13, 1889.)

CONTRACT—EVIDENCE.

Complainant alleged that he entered into an oral agreement with defendants to purchase certain mortgage railroad bonds, to be used in purchasing the roads on foreclosure, defendants to furnish the requisite funds, and complainant to furnish information and assistance. He and a third person, who did not appear to be interested, testified that the contract was made as alleged. while one defendant denied it, the other defendant having died before his testimony could be had. It appeared that at the time of making the alleged contract, complainant was receiver of the property of one of the roads, and general manager. under the company, of the other road. He was past 60 years of age, of good reputation, and highly respected. A large amount of money would be required to purchase the bonds, none of which, he alleged, was he to furnish; and, as bearing on defendants' reasons for making him an equal partner, claimed that he first originated and suggested the scheme to them, but defendants showed by unsuspected evidence that the scheme had been suggested to them about two years before. Complainant did not show that he had any information on the subject not known to the public. He and his witness testified that defendants said that they were anxious to have him interested because of the great change in the road since he had taken possession thereof, but it appeared that he knew that defendants were negotiating for a purchase of the bonds very soon after he took possession; and his testimony and that of his witness was inconsistent in other respects. Defendants purchased the bonds after two years' correspondence, none of which showed that complainant had any interest, and the persons with whom the negotiations were carried on did not suspect that he was interested, and his only knowledge of the negotiations was derived from the agents of the bondholders. After the purchase of the bonds, and before foreclosure, defendants, wishing complainant's assistance as receiver, in working one of the roads, which he was slow to give, applied to the persons from whom they purchased the bonds to urge him to take action. Meanwhile he wrote letters entirely inconsistent with his claim to be a partner of defendants. It also appeared that shortly after assuming control of the road, and at a time when, as he testified, he proposed to enter into the contract with defendants, he canceled contracts which one of the defendants held with the roads, and which were very advantageous to defendants and prejudicial to the road. *Held,* that the evidence did not show that the contract had ever been made.

In Equity. On bill for accounting.

*Beam & Cooke* and *Hiler H. Horton,* for complainant.

*Geo. B. Young, H. R. Bigelow, I. V. D. Heard,* and *M. D. Grover,* for defendant Hill.

BREWER, J. The original bill in this case was filed on November 13, 1880. It alleged a contract, and sought an accounting. An amended bill having been filed on December 15, 1880, the defendants, Kittson and Hill, filed a plea thereto, which was sustained in this court on the hearing before Judges TREAT and NELSON. 4 McCrary, 138, 14 Fed. Rep. 114. Complainant appealed to the supreme court, and, the case having been twice argued before that court, the judgment of this court was reversed, and the case remanded, with instructions to overrule the plea, and direct the defendants to answer. 120 U. S. 303, 7 Sup. Ct. Rep. 534. Thereafter an answer was filed, testimony has been taken, and the case argued, and now submitted upon the pleadings and proofs.

The decision of this court on the plea was to the effect that the contract alleged in the bill, if made, was one against public policy, and could not be enforced. The case in the supreme court passed off on a question of pleading, and the decision there, in no manner settling the question whether the contract as alleged was one which could be enforced or not, simply determined that the equities of the bill could not be considered upon a plea, and that a question of fact put in issue by the plea and replication, found for the complainant, compelled the overruling of the plea. So, at the end of nine years, the case now comes before me for decision, with no substantial question of law or fact settled. A brief statement of the questions presented is this: In 1876, complainant was, by appointment of this court, receiver of the property of the St. Paul & Pacific Railway, and also general manager of the lines of the First Division of the St. Paul & Pacific Railway Company, under the company, and subsequently under the trustees in certain mortgages in possession thereof. Several series of mortgage bonds were outstanding, largely owned and held in Holland. Complainant alleges that he and the defendants, Kittson and Hill, entered into an agreement for the purchase of these bonds, or a majority thereof, and the use of the same in the purchase of the road in the foreclosures of the mortgages. These defendants were to procure the funds necessary therefor, and the complainant to furnish facts, information, and assistance. Certain it is that the bonds were purchased by the defendants, Hill and Kittson, with two associates, foreclosures consummated, and the railway properties acquired. The question of fact, then, is whether such an agreement as alleged was entered into, and the question of law, whether, if made, it can now be enforced in a court of equity.

In reference to the question of fact, it may be premised that the complainant, Mr. Farley, and his then assistant in the management of the roads, Mr. Fisher, testify that an agreement was made substantially as alleged in the bill, while defendant Hill as positively denies the same. Defendant Kittson died before his testimony could be taken. Inasmuch as, according to complainant's testimony, only four persons were present at the making of the agreement, namely, Messrs. Farley, Fisher, Hill, and Kittson, the case, so far as respects the direct testimony rests upon three witnesses, two affirming and one denying; one of those affirming and the one denying being pecuniarily interested, and their interests opposed, while the other affirming has, so far as appears, no direct pecuniary interest. This, upon the direct testimony, leaves the preponderance in favor of the complainant; but where there is a square contradiction between witnesses of apparent credibility as to a principal fact like this, the solution is not always reached by a process of mathematics, a mere counting of the number of witnesses, but often requires a careful examination of all surrounding circumstances. In this case inquiry must be directed to the inherent probability, under the circumstances surrounding the parties, of the making of such an agreement; to the conduct of the parties prior and subsequent to that time; to any contradictions and supports which their respective stories may receive from other and un-

disputed facts; and to any statements, oral or written, inconsistent with their direct testimony. The testimony is voluminous, comprising nearly 2,000 printed pages, and with this testimony, in the various ways indicated, counsel for the opposing parties have striven to support their respective claims. It is not pretended that there was any written contract. Messrs. Farley and Fisher testify that at an interview which lasted about two hours the agreement was entered into, and its terms fixed.

Inquiry naturally runs, in the first place, to the situation of the parties and the subject-matter of the agreement at the time it is claimed to have been made, and the probabilities in view of such situation of the parties entering into such an agreement. Two corporations existed,—one, the St. Paul & Pacific Railway Company; the other, the First Division of the St. Paul & Pacific Company. Each owned a land grant. The First Division had two lines completed and in operation,—one, 76 miles in length, known as the "Branch;" and the other 207 miles long, and known as the "Main Line." The St. Paul Company had one line of about 60 miles graded and partly ironed, and another of about 310 miles on which 139 miles was completed. In addition, some work of grading had been done on this last line. So that there was over 400 miles of completed road, several miles partially completed, and a land grant. These various properties were mortgaged in several mortgages, amounting in the aggregate to $28,000,000. Some of the bonds secured by these mortgages had been taken up in the payment of lands sold, and possibly all had not been negotiated, but the great bulk of this indebtedness stood against the property. The stock of the First Division of the company was mainly owned by Messrs. Litchfield, and of the St. Paul Company by the Northern Pacific Railway Company. The bonds had been largely negotiated in Holland, and these Dutch owners in 1873 appointed a committee to enforce their rights and protect their interests. This committee appointed J. S. Kennedy & Co., of New York city, as its agents. In 1873 there was a default in the payment of interest. Suit was brought in this court at the instance of Messrs. Kennedy & Co., and in August, 1873, this complainant was appointed receiver of the St. Paul Company's properties. He continued as such receiver until the final foreclosures and sales in 1879. The First Division Company's property remained in the possession of the company for some time after the appointment of Mr. Farley as receiver of the St. Paul Company, Mr. Becker being the president and person in charge. In 1875 an arrangement was made between the stockholders and bondholders of the First Division Company, by which the directory was constituted in the interest of the bondholders, and on March 13, 1876, Mr. Farley took possession of these properties as general manager for the company, temporarily, at least, controlled by the bondholders. The arrangement between the bondholders and stockholders did not work out as expected, and in October, 1876, the trustees in the mortgages took possession, continuing Mr. Farley as general manager for them. The agreement was made, according to complainant's testimony, during the year 1876, and while he was in the possession of the St. Paul Company's property as receiver,

and of the First Division Company's property as general manager. Mr. Farley was at the time a gentleman past 60 years of age, having spent most of his active life in the state of Iowa, engaged part of the time in mercantile enterprises and part in railroad business. Important trusts had been placed in his hands, and he had so managed these trusts as to win the confidence of those so placing them. He was selected by Messrs. Kennedy & Co., who had had experience in railroad matters in Iowa, to act as receiver of these properties in Minnesota, and their selection was approved by the circuit judge of this court, himself a citizen of Iowa, and doubtless familiar with Mr. Farley's reputation. Now, the agreement was, as claimed, to purchase the outstanding bonds, or a majority of them, and, as complainant expresses it, inherit the property at the fore-closure sales. It was Mr. Farley's duty as receiver not merely to pre-serve the property in his hands, but to so manage it as to make it as productive as possible, and so realize as much as possible for the bond-holders. Is it probable that a man so situated, with his years of expe-rience in railroad foreclosures, and owing such a duty to the bondhold-ers, would enter into a secret arrangement with third parties for the pur-chase of the bonds,—an arrangement which made it for his interest to re-duce the market price of the bonds? Is it probable that such a man would deliberately cloud the record of his life, and burden the discharge of official duty with the adverse and potent and ever-pressing weight of private pecuniary interests? The question we are now considering is not that of his present testimony, but, standing back in the year 1876, would it then have easily been believed that Mr. Farley had entered into such a contract? Supposing the situation changed, and in 1876 an ef-fort had been made to remove him from the receivership on the testi-mony of two witnesses that he had made such a contract, he positively denying the same, would not the court have been slow to believe him guilty of such a dereliction of duty? Would not the presumption of in-nocence, strengthened by all the weight of a long life of probity, have borne strongly in his favor? Is the probability any less when it is he that affirms and another that denies? Nor is this a case where some merely technical rule is infringed,—something whose wrong only a legal mind can perceive. The commonest intellect is not too dull to perceive that such a contract produces a constant conflict between duty and pri-vate interests. Officially it was his duty to improve the property, and increase the value of the bonds; as a proposed purchaser it was his inter-est to deteriorate the property, and decrease the value of the bonds. So I affirm that all the probabilities make against the story of the contract.

Again, looking further into the contract, it appears that complainant was to furnish no money and assume no pecuniary risk, all of the money to be furnished or procured by Messrs. Hill and Kittson, his contribution being limited to information, advice, and assistance. Now, the scheme was no trifle, and could not be carried into effect without large sums of money. A majority of twenty-eight millions of bonds cannot be bought for a song, even if they are sold at a large discount. In fact the prices at which they were bought ranged from 13¾ to 75 per cent. Now, it

is common experience that, when undertakings are entered into in which large sums of money are needed, the men who furnish the money and assume the pecuniary risks take the lion's share of the profits, and the one who furnishes none must be a very potent factor in carrying into success the undertaking before he receives an equal share. And here may well be quoted the exact language used by the parties, as testified to by Mr. Fisher:

"Mr. Farley told Mr. Kittson that he had no money. He said: 'I have no money, Mr. Kittson.' Mr. Kittson said: 'We do not want you to furnish any money.' Mr. Hill says: 'Certainly not.' Then Mr. Hill explained how they would get the money. He went over the thing again,—about Mr. Smith, and his relations, etc., with Mr. Stephen, the president of the Bank of Montreal; and it was through that channel that they were going to get the money. Then Mr. Kittson says: 'We will furnish the money, Mr. Farley. We don't want any money from you. What we want of you is your judgment and advice, and we will attend to the rest of it.'"

And to the same effect, though not so fully in detail, is the testimony of the complainant himself. This leads us to inquire what, according to complainant's account, was the consideration, and what were the inducements which led to this promise of an equal interest? It is claimed that complainant originated the scheme; that he was possessed of information not belonging to defendants in respect to the properties, their incumbrances, the holders of the bonds, and the prices at which they could be obtained, and had means and facilities for aiding in the negotiations, not accessible to the defendants; that he had acquired a large reputation as a railroad manager, which rendered his connection with the project one of value. Both complainant and Mr. Fisher, in their account of the various interviews which led up to the agreement, and the one in which the agreement was consummated, picture themselves as originating the enterprise,—as first suggesting it to defendants,—and the latter as having or pretending to have their attention called for the first time to the matter. So that the complainant would have it that the defendants, realizing that he was the originator of the scheme, felt themselves under a sort of moral obligation to take him in as an equal partner. As against this suggestion of reasons and considerations, the defendants show by testimony independent of themselves, and which is not open to suspicion, that in 1873 and 1874—more than two years before complainant claims to have suggested the scheme—Donald A. Smith, the representative of the Hudson Bay Company's interests in this country, anxious to have a line of railroad extended northward and in the direction of his company's property, had his attention called to this incomplete line from St. Paul northward towards that property; that at his instance Messrs. Hill and Kittson made investigations as to the situation of the railroad, its prospects and incumbrances, and that the acquisition of this property was by the defendants a matter of consultation and consideration in connection with Donald A. Smith for a couple of years before complainant says he suggested the matter. It is not pretended that during these years any definite scheme as to the acquisition

of this property was determined upon between these parties; and for that matter complainant does not pretend that in the interviews between himself and defendants a definite plan of acquisition was determined upon, but simply that the bonds were to be acquired and the purchasers to inherit the property at the foreclosure sale. It is strange that the defendants, who for two years had been considering the matter, and had availed themselves of the opportunities furnished by the records of the courts to ascertain the amount of the incumbrances, the residence of the Dutch committee, and the number of bonds held by it, whose business relations in a transportation way with the railroads enabled them to become fully acquainted with their condition, and whose attention had been directed to them by one who had a manifest interest as the representative of the Hudson Bay Company, should pretend to be, as complainant and Mr. Fisher assert, entirely ignorant, and act as though the suggestion was then first made to them. They certainly were not ignorant of the situation, and it is hard to believe that they pretended to be. Neither is any matter shown by complainant, of which he had knowledge, which was not a matter of public knowledge through the records of the court, and easily ascertainable from those records, and bond transactions and reports at a bank whose cashier was of Hill a special and intimate friend. To think for a moment that the picture drawn by the complainant of the magnificent scheme first unfolded before the astonished eyes of the defendants of the acquisition of the bonds, and through them of the railroad property, is, in view of the overwhelming testimony, most absurd.

As complainant did not first suggest the idea to defendants, as he was not possessed of information unknown to them, the further inquiry arises whether he had acquired such a reputation as a railroad manager as would lead defendants to divide the profits without sharing the risks with him, and here the question of the time at which the agreement was made becomes important. In their first testimony complainant and Mr. Fisher located the interviews, preliminary and final, in the months of August and September, 1876. Between the original and final interview much time elapsed. Complainant says: "From time to time, running through a good many weeks, Mr. Hill and Mr. Kittson continued to talk to me about this matter of purchasing the bonds;" and testifies that the interviews took place in August and September. Mr. Fisher shows that the time between the first and final interview must have been some weeks. He locates the first interview in August, saying that it was hot weather, and the final interview in September, when cold weather had begun, and when they were having a little fire. The complainant also volunteered this testimony, saying that he did not know whether it was important or unimportant, as transpiring at the first interview between himself and defendants:

"Mr. Kittson said: 'Mr. Farley, you are receiver under the court of one of these lines of road, and general manager of the other line under the trustees in possession, and, in order to succeed in this enterprise, it would be best for you not to be known in it, for here are the Litchfields and Mr. Bigelow

and Mr. Becker fighting for the possession of the property,'—as he called it 'fighting.' It was in the law business for the possession of the property. If it was known by these parties that you are interested in the purchase of the bonds, these parties would go into court, and ask for your removal; and in that event I wouldn't give a dollar for the whole thing.' Upon a moment's reflection, I thought Mr. Kittson was right about it, and then and there, with Mr. Hill, Mr. Fisher, and myself, it was sacredly agreed— (Objected to.) *Question.* State what was said by the parties. *Answer.* Mr. Kittson and myself agreed that that was the best plan to pursue; and Mr. Fisher, as a matter of course, had nothing to do with it, and Mr. Hill didn't object to it,—thought maybe it was a good thing. That was a very sacred point with Mr. Kittson clear through the whole transaction. He looked at it as very important."

Mr. Fisher also testified that defendant Kittson used this language:

"My recollection is that Mr. Kittson said that Mr. Farley— I wouldn't be positive about the exact words, whether he said he had made a great change in the property, or whether he said he had improved the property,—but that is the substance of it; that he noticed a change in the management; and my recollection is that Mr. Kittson also said: 'Between you and I, I didn't have much confidence in the former management.' I think Mr. Kittson said something like that also. I wouldn't undertake to give the exact words."

Now, Mr. Farley did not take possession under the trustees until October, 1876. He did take possession under the company in March, 1876, and, assuming that the language of the complainant was used through an inadvertence or a mere mistake of memory, and that the reference was to possession under the company, it shows that the conversation could not have been earlier than March 13th; and according to Mr. Fisher it was long after possession taken in March, and after Mr. Farley had made a great change in the property. Now, after this testimony had all been given with these particularities of date and weather and remarks, it appeared that in the latter part of March and the first part of April, which was immediately after Mr. Farley took possession as manager, Mr. Barnes, one of the firm of Kennedy & Co., and the president of the First Division Company under the arrangement between the stock and bond-holders, visited St. Paul, to look after the property. And it further appeared from the complainant's own letter of June 3, 1876, that prior to that time the defendants had had a conversation with Mr. Barnes in reference to the purchase of these bonds, and that the conversation was so long prior thereto that the defendants were beginning to be worried in respect to the matter. This is his language:

"N. W. Kitson *is geting anxious about the Big Operation of* Geting control of 1st Div. Also Extension Lines. He can get the money. What do you think can be done, you have his proposition in your Memory. I would again say to you I think there is a big thing in the Main Line 3 and 6 million Bonds at their present Selling price. Yours &c.          J. P. FARLEY."

This shows beyond any reasonable doubt that in March or April, and when Mr. Barnes was in St. Paul, defendants had to the knowledge of the complainant been talking to him as a representative of the Dutch committee in respect to the purchase of these bonds. What shall be said, therefore, as to the suggestion that Mr. Kittson was anxious that Mr. Farley be interested because of the great change he had wrought in

the property since his possession? What of the statement of Mr. Fisher that the first conversation was during excessively warm weather, and the final one weeks afterwards, when it had begun to turn cool, and they had fires?

Again, as appears from the above, it is incontestable that in the early part of 1876 defendants, Hill and Kittson, had some negotiations with the agent of the Dutch committee in reference to the purchase of the bonds. The final agreement for the purchase by the defendants, Hill and Kittson, with George Stephen and Donald A. Smith, was dated the 13th of March, 1878, and signed by the members of the Dutch committee on April 6, 1878. During these two years at least two written propositions or offers passed from Hill and Kittson to the Dutch committee, and negotiations, both by letter and telegram and orally, were carried on between these four parties and Kennedy & Co., the agents of the Dutch committee. During all these negotiations not a scrap of writing appears which shows that Mr. Farley had any interest. Neither the Dutch committee nor their agents knew that he was or claimed to be an associate. Messrs. Smith and Stephen, actively .engaged in the negotiations, frequently communicating with Hill and Kittson, (with interests as between themselves understood, and finally settled by contract in writing,) neither knew nor suspected that Mr. Farley was in any way interested; and all the information which he had in reference to the transactions seems to have been acquired from Kennedy & Co., who had selected him as their representative in Minnesota, and from communications which they sent through him to Messrs. Hill and Kittson. Such ignorance on the part of these various gentlemen is, to my mind, strangely inconsistent with the existence of the alleged relation between complainant and defendants.

Again, after the final execution of the contract between the four associates and the Dutch committee in the spring of 1878, more than a year elapsed before the consummation of the transaction and the foreclosure sales in the spring of 1879. During this time, and in execution of the contract, the associates agreed to complete some unfinished portions of the road, and, to do this, orders of the court and the active co-operation of Mr. Farley as receiver were requisite. Mr. Farley seems to have been reluctant and slow, and the associates were frequently seeking through Kennedy & Co. to urge and accelerate his action. How inconsistent this is with the idea that all the while there was a partnership arrangement between him and Hill and Kittson. If he knew that he was a partner, and they knew he was a partner, would not their communications have been directly to him, and would anything more have been needed than a mere suggestion from them to him? Further than this, on February 22, 1879, after the contract had been executed between the associates and the Dutch committee, and the matter was coming on to final consummation, Mr. Farley writes this letter to Messrs. Kennedy & Co.:

"I have your confidential favour 18th for which I am under many Obligations. I would be pleased to have your understanding of the contract as to the Number of Bonds of each Isue Mess. Hill & Kitson and their assosiates are under obligation to take under the arrangement. You will understand

the Drift of my Inquiries. *It has been more than intimated to me that Mess. H. & K. would be pleased to make me interested in there Shares of what may result from this trade in order to have me help them work the matter through in Minnesota, care for the property, &c. My judgement is, some of these Bonds is cheap at the price named, and others very much higher than I would pay.* Yours &c. J. P. FARLEY."

To which Mr. Kennedy, on February 25th, sent this reply:

"We think it will pay you to take an interest with K. & H. and we are glad to hear that they have offered it to you. The purchase has now been concluded; we have so advised the committee at Amsterdam by cable to-day, and it will be publicly announced there to-morrow morning."

On May 23d of that year complainant writes to John S. Barnes this letter:

"Since the election of Bigelow & Galusha as Directors in the New Company, Men of no Money, railroad experience or Influences, And myself left out in the cold, *I am forced to the conclusion that My time and claims on the St. Paul & Pacific is Short, I did expect better things of Hill and Kittson.* I had a talk with Jim Hill last Knight, He disclaims any intention on his part to ignore my Claims, but he is such a Lyer can't believe him. It is a matter of astonishment to every person in St. Paul to see the way Jim handles Mr. Stephens. He is notoriously known to be the bigest lier in the state. Mr. Kitson has told me time and again that Jim Hill was the worst man he ever saw. Upham, P. H. Kelly, Thompson and in fact every citizen in St. Paul if they would Speak their Sentiments would all tell the same story. *You Must Not blame Me if I should try to get even with Jim Hill before I leave here.*"

And on May 29th, to Mr. Kennedy, this letter:

"Your letter 26th reached me this morning; fortunately we had just made arrangements to send the Car to Chicago with Mr. Smith and Lord Elveston. I hope it will reach there in time for you and your party. Pressing Business compells me to be absent a few days. I have had some sharp talk with Mr. Hill. *If he Persists in his Present course to Ignore all my claims to Share in the honours or profit to some small degree, He may have cause to Regret it,* I hope to be back early next Week."

It is impossible, in my mind, to reconcile the statements in those letters with the idea that all the while there was a subsisting and recognized agreement for an equal share in the enterprise. No man who was an equal partner would talk in respect to his associates and the transaction in the way Mr. Farley does in these letters. If there were nothing else in this case to invalidate his claim to a contract for an equal share with the defendants, these letters would stand, in my mind, as a convincing answer thereto.

Another matter, earlier than these letters, also deserves notice. At the time Mr. Farley took possession under the company as general manager, Mr. Hill, or the firm of which he was a member, had two contracts with the railroad company which were claimed to be very profitable to the contractors and disadvantageous to the company. Within a few weeks after taking control, Mr. Farley canceled these contracts. The later testimony of Messrs. Farley and Fisher necessarily locates the date of the agreement close to the time of Mr. Farley's taking possession.

It is inconceivable that Mr. Farley, having entered into, or proposing to enter into, an agreement with Messrs. Hill and Kittson for the purchase of these bonds, should cancel contracts supposed to be beneficial to one of his associates. If he thought the contracts were injurious to the company's interests, his interest in the purchase of the bonds at as low a price as possible would have compelled a continuance of the contracts with whomsoever they were made. And his new relations with · Mr. Hill as an associate would in like manner tempt to forbear offending him by canceling so beneficial a contract.

The length to which I have already extended this opinion forbids my notice of other matters, such as the discrepancy between the facts as alleged in this bill, and those stated in the petition filed in 1879, in a case in the state court, which the supreme court of the state held insufficient to make a cause of action, (*Farley* v. *Kittson*, 6 N. W. Rep. 450;) the testimony of plaintiff and Mr Fisher as to a conversation with Mr. Kittson in respect to a newspaper article in February, 1878, which, when shown to be impossible by the absence of Mr. Kittson in New Orleans, they attempted to connect with a prior newspaper article in the previous fall; and the conversations had in the presence of the judge of this court, in the presence of Mr. Farley, after the execution of the agreement to purchase between Mr. Hill and his associates and the Dutch committee,— each of which makes against the claim of an alleged agreement. There are many of these matters, some of them trifling, it may be, but by their very multitude carrying conviction. The surroundings are potent against the truth of complainant's claim. Very likely many of the things testified to by Messrs. Farley and Fisher were said by Messrs. Hill and Kittson to them. Their business relations were such that they were often brought in contact, and doubtless had frequent conversations; but I doubt not that whatever they have truthfully said were the gathered fragments of many talks,—mere *disjecta membra*. I cannot believe from the testimony that at any time the complainant and the defendants had that full distinct talk which complainant and Mr. Fisher testified to, or that there was ever a definite coming together of the minds of the parties in reference to an agreement for the purchase of these bonds. In other words, I think that Mr. Farley, as a receiver, did not fail in his official duty, and, although such conclusion carries an imputation upon his recollection or veracity as a witness, it sustains his integrity as an officer. The contract as set forth in complainant's bill was never, in my judgment, entered into, and a decree must be entered dismissing the bill.